IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DONNA KENDRICK,  )
                 )
   Plaintiff,    )
                 )
v.               )    CASE NO. CV415-074
                 )
AETNA LIFE INSURANCE COMPANY,  )
                 )
   Defendant.    )
_____)

# ORDER

Before the Court is Defendant's Motion for Judgment on the Administrative Record. (Doc. 13.) For the following reasons, Defendant's Motion for Judgment on the Administrative Record (Doc. 13) is **GRANTED**. The Clerk of Court is **DIRECTED** to close this case.

## FINDINGS OF FACT

Plaintiff Donna Kendrick brings this case to challenge Defendant's decision that she was not entitled to long term disability ("LTD") benefits under an employee welfare benefit plan (the "Plan") sponsored by Gulfstream Aerospace ("Gulfstream"). Plaintiff was an "aftermarket expediter" with Gulfstream. (AR 848-49.)[1] She identified her duties as "processing customer's parts/equipment to send out for repair,"

---

[1] For purposes of this opinion, the Court references the Administrative Record ("AR") as provided by the parties. (Doc. 13, Attach. 2-24.)

and noted that she was required to sit for seven to eight hours a day, stand for two hours a day, and walk for one hour a day. (AR 842.)

Plaintiff was covered under a Group Accident and Health Insurance Policy issued by Aetna Life Insurance Company to General Dynamics Corporation. (AR 002.) Gulfstream was covered as a member employer under the Plan. (AR 009.) According to the Plan, Defendant has "discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of [the] policy." (AR 021.) A covered employee would be considered disabled and entitled to benefits if they were "not able to perform the material duties of [their] own occupation solely because of: disease or injury; and [the employee's] work earnings are 80% or less of [their] adjusted predisability earnings." (AR 025.) An employee's "own occupation" is defined as "the occupation that [the employee is] routinely performing when [their] period of disability begins." (AR 038.) For purposes of the plan, an employee's "own occupation" is "viewed as it is normally performed in the national economy, instead of how it is performed: for [the employee's] specific employer; or at [their] location or work site." (Id.)

In May 2013, Plaintiff filed a claim for LTD benefits beginning on December 4, 2012. (AR 848-49.) She claimed that she

was suffering from uncontrolled Type II diabetes which resulted in fatigue, dizziness, confusion, short term memory loss, and migraines. (AR 522-23.) She also claimed that she suffered from gastrointestinal distress, a rash, joint pain, and sleep problems. (Id.)

Plaintiff provided medical records from December 2012 through May 2013. Plaintiff's records indicated that she went to Surgical Specialists of Savannah in December 2012 complaining of hemorrhoids, abdominal pain, fever, diarrhea, and rectal bleeding. (AR 453-55.) She subsequently underwent a CT scan of her abdomen and a colonoscopy. (AR 467.) Her treating gastroenterologist—Dr. Ansley S. Tharpe—noted that the scan showed a "left renal calculus and evidence of cholecystectomy and hepatic steatosis." (AR 467.) However, Dr. Tharpe noted that the scans were "otherwise unremarkable." (Id.) Dr. Tharpe also included a note that Plaintiff had not been using her prescribed medication. (Id.)

Plaintiff underwent an ultrasound on January 10, 2013 to determine what was causing her pain. (AR 907.) Dr. Andrew Wade read the scan and sent his findings to Dr. Richard Hightower— Plaintiff's treating internist. (Id.) The scan indicated "fatty infiltration" of the liver, but the scan was otherwise normal and did not include any findings to account for pain. (Id.) However, Plaintiff's pain continued. On January 16, 2013,

3

Plaintiff complained to Dr. Tharpe of abdominal pain, bloody stool, and heartburn. (AR 884.) Dr. Tharpe referred Plaintiff for a celiac panel, thyroid-stimulating hormone tests, and stool studies. (AR 886.) She was also scheduled for a colonoscopy and endoscopy. (Id.)

On February 4, 2013, Plaintiff visited Dr. Hightower. (AR 892.) He noted that Plaintiff continued to complain of stomach pains. (Id.) In regards to Plaintiff's diabetes, Dr. Hightower noted that her blood sugars were not well controlled. (Id.) Dr. Hightower completed a form indicating that Plaintiff was unable to work at that time, but that she was likely to return to work on February 25, 2013. (AR 891.)

Plaintiff visited Dr. Tharpe again on February 21, 2013, to follow up on the results of her tests. (AR 467.) Dr. Tharpe noted that the colon biopsies were unremarkable. (Id.) Dr. Tharpe did note that Plaintiff's tests indicated diverticulosis, external hemorrhoids, and some erosion in the antrum. (Id.) However, Dr. Tharpe's notes acknowledged that Plaintiff's other tests were unremarkable. (Id.) Based on these results, Dr. Tharpe referred Plaintiff for a "solid gastric emptying study." (AR 690.) The results of this test showed an "abnormal" reading of "rapid gastric emptying." (Id.)

Plaintiff's complaints were not limited solely to diabetes and gastric distress. She returned to Dr. Hightower on March 4,

4

2013, with complaints of a red, tender, bumpy, and itchy rash. (AR 927.) The rash was located on Plaintiff's chest, arms, genitals, and under her breasts. (Id.) Plaintiff told Dr. Hightower that moisturizers, antibiotics, antifungals, oatmeal baths, and topical corticosteroids did not relieve the rash's symptoms. (Id.) After examining the rash, Dr. Hightower noted that Plaintiff's diabetes medication had been changed (id.), and prescribed Plaintiff medication to help treat the rash (AR 929). Dr. Hightower again provided Plaintiff with a note indicating that she could likely return to work on March 18, 2013. (AR 896.) However, Plaintiff's rash did not improve and her blood sugars remained high, even with new insulin adjustments. (AR 930.) As a result, her diabetes medication was increased and she was referred to a dermatologist for the rash. (Id.)

On March 28, 2013, Plaintiff met with her treating endocrinologist Dr. James Stoever. (AR 486.) Dr. Stoever noted that Plaintiff had met with a dermatologist regarding a rash, and that the dermatologist felt that the rash was a drug reaction. (Id.) Dr. Stoever also noted that Plaintiff had been struggling with her blood sugars. (Id.) As a result, Dr. Stoever changed Plaintiff's medication and increased her insulin. (Id.) Dr. Stoever asked Plaintiff to call in a week to let him know whether she was feeling better. (AR 488.) He also noted that he

5

would check Plaintiff's thyroid antibodies and levels to make sure that her thyroid was not causing her symptoms. (Id.)

On April 2, 2013, Plaintiff met with Dr. Hightower. (AR 940.) While Plaintiff indicated that her rash had not improved, she did state that she felt well and had no complaints. (Id.) Dr. Hightower referred Plaintiff to Dr. Bruce Finkel for her rash. (AR 942.) Dr. Finkel prescribed lotrisone, moisturizer, nizoral, and diflucan to treat the rash. (AR 543.) Dr. Hightower provided another note indicating that Plaintiff could not return to work at that time, but that she could return on May 1, 2013. (AR 939.)

Plaintiff returned to Dr. Stoever on April 9, 2013, for a follow up appointment. (AR 500.) Dr. Stoever stated that Plaintiff's rash was still causing substantial itching and that Plaintiff complained of a migraine that had affected her weekend. (Id.) Dr. Stoever also noted that Plaintiff had not taken her insulin. (Id.)

On April 10, 2013, Dr. Hightower determined that Plaintiff would be able to return to work on May 1, 2013. (AR 948.) He stated that Plaintiff was suffering from "multiple issues" including stomach problems, diarrhea, and nausea. (Id.) Dr. Hightower explained that Plaintiff's diabetes had become uncontrolled as a result of these stomach issues. (Id.) He explained that Plaintiff was prescribed insulin, but that this

6

had caused a severe rash that was unresponsive to medication. (Id.) Dr. Hightower further explained that Plaintiff was seeing an endocrinologist—who was attempting to adjust Plaintiff's insulin treatment—and that Plaintiff was unable to work because of extreme fatigue, nausea, diarrhea, light-headedness, blurred vision, and headaches. (Id.) Dr. Hightower also explained that the rash was so severe that Plaintiff was unable to wear clothing. (Id.)

On April 24, 2013, Plaintiff returned to Dr. Stoever to check on her diabetes. (AR 952.) Dr. Stoever noted that Plaintiff's rash was somewhat improved and that her blood sugars appeared better, but that Plaintiff had stopped consistently checking her blood sugars. (Id.) As a result of the rash, Dr. Stoever changed Plaintiff's medication again. (Id.) On May 2, 2013, Dr. Hightower noted that Plaintiff could return to work on May 20, 2013. (AR 970.) Plaintiff saw Dr. Stoever on May 7, 2013 and he noted that while Plaintiff had not been checking her blood sugars, the rash on her arms appeared to be doing significantly better. (AR 529.)

On June 6, 2013, Plaintiff's "elimination period"—"the length of time during which a period of disability must pass before benefits start"—ended. (AR 25.) At that time, however, Defendant was unable to determine that Plaintiff was incapable of performing her job because none of Plaintiff's physicians had

7

indicated that she was disabled. (AR 76.) Accordingly, Defendant requested that Plaintiff have her doctors complete capabilities and limitations worksheets ("CLW") and attending physician statements ("APS"). (AR 223-24.)

Dr. Hightower completed these forms on June 26, 2013. (AR 858.) In the forms, Dr. Hightower explained that Plaintiff suffered from diabetes, migraines, psoriasis, nausea, dizziness, anxiety, reflux, irritable bowel, and diarrhea. (AR 858.) He noted that Plaintiff could lift 1-5 pounds frequently, 6-10 pounds occasionally, and 11-20 pounds occasionally. (Id.) However, Dr. Hightower noted that Plaintiff had no ability to work. (AR 860.) Defendant conducted a clinical review of these records, but determined that there were "no objective findings to support disability." (AR 83-84.) As a result, Defendant requested additional records from Dr. Stoever and Dr. Tharpe to support Plaintiff's diabetes diagnosis. (Id.)

On July 9, 2013, Dr. Tharpe provided the requested follow up information and noted that Plaintiff felt well with minor complaints. (AR 778.) However, Dr. Tharpe noted that Plaintiff was still experiencing diarrhea and other gastrointestinal problems, including upper abdominal pain and some nausea. (Id.) Dr. Tharpe indicated that Plaintiff had a history of fatty liver. (Id.) Dr. Stoever, however, did not complete APS and CLW forms for Plaintiff. (AR 100.) Nevertheless, Dr. Stoever met

with Plaintiff on July 10, 2013, and medical records indicate that Plaintiff's rash was much better. (AR 552.)

After further review of the records, Defendant still felt that it was unclear why Plaintiff was unable to work. (AR 111.) However, Defendant decided to approve Plaintiff's long term disability claim effective June 6, 2013, pending independent medical review. (Id.) Dr. Edward Klotz was hired to conduct this independent review. He conferred with Drs. Hightower and Stoever on August 26, 2013. (AR 559.) Dr. Hightower denied that Plaintiff was disabled and also indicated that he did not remember filling out the APS and CLW forms. (Id.) Dr. Stoever informed Dr. Klotz that Plaintiff's diabetes was not disabling and that Plaintiff was otherwise stable. (Id.) Although Dr. Klotz reached out to Dr. Finkel, Dr. Finkel was unable to speak about the severity of Plaintiff's rash. (Id.) Based on Dr. Klotz's review of the record, his correspondence with Plaintiff's treating physicians, and the medical records provided in the case, Defendant determined that Plaintiff was able to perform both her job at Gulfstream and a similar occupation in the national economy. (AR 126-27.) As a result, Defendant terminated Plaintiff's LTD benefits on October 11, 2013. (AR 248.) Plaintiff was subsequently informed of the termination of her benefits. (Id.)

On October 16, 2013, Defendant received additional documentation from Plaintiff. Specifically, Dr. Hightower provided a certificate indicating that Plaintiff was unable to return to work until further notice. (AR 561.) Dr. Hightower cited Plaintiff's extreme changes in blood sugar levels, frequent diarrhea, abdominal pain, migraines, skin rash, and difficulty eating. (Id.) However, this additional information was not enough to change Defendant's LTD decision. (AR 251.)

On December 3, 2013, Plaintiff exercised her right to appeal the denial of LTD benefits. (AR 669-71.) Plaintiff disagreed with Dr. Klotz's review and also disputed that Dr. Klotz had spoken with her doctors. (AR 669.) She included additional records from Dr. Tharpe and Dr. Stoever that noted that Plaintiff had undergone a series of tests including a barium swallow analysis and an abdomen CT, both of which were unremarkable. (AR 672.) However, the same records indicated that Plaintiff's rash was improving. (AR 715.)

As part of the appeal, Defendant provided Plaintiff's medical records to Dr. Leonard Schnur, a psychologist, and Dr. Wendy Weinstein, a board certified doctor in internal medicine. (AR 336-47.) Dr. Schnur determined that there was no medical evidence of any cognitive, emotional, or behavioral impairment. (AR 346.) Dr. Weinstein determined that Plaintiff was able to perform her work and specifically noted that while Plaintiff was

suffering from diabetes, there was no record that there were significant physical symptoms of diabetes. (AR 341.) Dr. Weinstein also discounted reports of Plaintiff's rash making it difficult for her to wear clothing based on the fact that Plaintiff had appeared at her doctor's appointments well dressed. (Id.) Dr. Weinstein also opined that Plaintiff's migraine headaches and hypercholesterolemia would not prevent Plaintiff from working. (AR 342.)

Neither Drs. Hightower nor Stoever responded to Dr. Weinstein's request for comment. In addition, Drs. Hightower and Stoever did not provided any comment on Drs. Schnur or Weinsten's reports when those reports were provided to them for review. Dr. Weinstein was able to speak with Dr. Tharpe, who informed Dr. Weinstein that she had not placed work restrictions on Plaintiff. (Id.) Dr. Hightower did speak briefly with Dr. Schnur about Plaintiff's psychological issues. (AR. 424.) Dr. Hightower noted that Plaintiff had been seeing a psychologist. (Id.) However, Defendant never received any further records from Plaintiff regarding her psychologist. (AR 183.) After this secondary review, Defendant upheld Plaintiff's denial of benefits. Plaintiff filed her complaint in this Court on March 20, 2015 alleging improper denial of benefits pursuant to 29 U.S.C § 1132(a). (Doc. 1.)

**CONCLUSIONS OF LAW**

Individuals who are "denied benefits under an employee benefit plan [may] challenge that denial in federal court," pursuant to the Employee Retirement Income Security Act ("ERISA") of 1974. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). In an ERISA benefits denial case the Court "does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Curran v. Kemper Nat. Servs., Inc., 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (citing Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir.2002)).

The Eleventh Circuit has "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions." Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989)). This multi-step framework is as follows;

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Id. at 1355.

"A decision is 'wrong' if, after a review of the decision of the administrator from a de novo perspective, 'the Court disagrees with the administrator's decision.'" Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008) (citing Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1138 (11th Cir. 2004)). In determining whether a decision is de novo wrong, "the court applies the terms of the policy." Ruple v. Hartford Life & Acc. Ins. Co., 340 F. App'x 604, 611 (11th Cir. 2009) (citing 29 U.S.C. § 1104(a)(1)(D); Oliver v. Coca Cola Co., 497 F.3d 1181, 1195 (11th Cir. 2007)). As discussed below, the Court concludes that Defendant was

vested with discretion in reviewing claims and that Defendant's decision in this case was reasonable. Accordingly, the Court assumes without deciding that the decision was de novo wrong for the purposes of this review.

I. DEFENDANT'S DECISION WAS NOT ARBITRARY AND CAPRICIOUS

Defendant in this case is vested with discretion in reviewing claims. (AR 021.) Accordingly, the Court reviews the LTD decision denying benefits for whether it was supported by reasonable grounds. "Under the arbitrary and capricious standard of review, the court seeks 'to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the administrator at the time the decision was made.'" Townsend v. Delta Family-Care Disability and Survivorship Plan, 295 F. App'x 971, 976 (11th Cir. 2008) (quoting Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888, 912 (11th Cir. 1997)). Based on the record in this case, the Court concludes that Defendant possessed a reasonable basis for the denial of LTD benefits.

Plaintiff argues that Defendant's decision that Plaintiff is not entitled to benefits pursuant to this review is arbitrary and capricious. (Doc. 16 at 6.) Plaintiff's main argument is that Defendant "retained one or more consultants to view [Plaintiff's] records from afar to determine her actual condition." (Id.) Plaintiff also disagrees with the position

14

that there was insufficient objective medical evidence of Plaintiff's inability to work. (Id.)

However, neither of these arguments indicates that Defendant's decision was arbitrary and capricious. As an initial matter, "[i]t is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled." Hufford v. Harris Corp., 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004) (citing Donato v. Metro. Life Ins. Co., 19 F.3d 375, 380 (7th Cir. 1994)). Accordingly, the fact that Defendant hired consultants to evaluate Plaintiff's claim of disability does not, on its own, make the decision arbitrary and capricious.

Next, there was sufficient medical evidence to support Defendant's decision. First, Plaintiff's gastroenterologist made no determination that Plaintiff was disabled. (AR 341.) Second, Plaintiff's endocrinologist concluded that Plaintiff's "diabetes was not disabling and that her diabetes was stable." (AR 559.) Third, Dr. Hightower's opinion that Plaintiff was disabled—the only such opinion offered—was neither internally consistent with his own treatment history or with other medical evidence. Dr. Hightower cleared Plaintiff to return to work on multiple occasions, noted more than once that her conditions were

15

improving with treatment, and also indicated that Plaintiff could lift 5 pounds frequently; and sit, stand, pull, push, carry, and lift up to 20 pounds occasionally. (AR 860.) Finally, Dr. Hightower, after speaking with Dr. Klotz, noted that he did not consider Plaintiff to be disabled. (AR 559.)

The cases Plaintiff cites to in support of her allegation that the administrator's determination was arbitrary and capricious because Defendant concluded there was insufficient medical evidence are not relevant here. First, Lee v. BellSouth Telecomms., Inc., 318 F. App'x 829, 837 (11th Cir. 2009), dealt with a plaintiff who was suffering from chronic pain syndrome. There, the court noted that chronic pain syndrome could not be diagnosed by laboratory tests. The court concluded that the plan administrator had acted arbitrarily and capriciously when it required objective medical evidence to show such a disability. Second, in Oliver, 497 F.3d 1181, the court determined that an administrator could not ignore relevant medical evidence. However, Plaintiff's case involves neither chronic pain syndrome nor evidence that Defendant ignored relevant medical evidence. First, as discussed above, Dr. Hightower's opinion that Plaintiff was disabled was contradicted by his own records and by Plaintiff's other physicians. Second, there is no indication in the record that Defendant ignored relevant medical evidence because it could not be verified by a laboratory test. Instead,

Defendant weighed the contradictory evidence provided by Dr. Hightower and Plaintiff's other treating physicians and resolved that conflicting evidence. Townsend v. Delta Family-Care Disability & Survivorship Plan, 295 F. App'x 971, 977 (11th Cir. 2008) ("[A] plan administrator is entitled to weigh the evidence and resolve conflicting evidence about the claimant's disability.").

II. CONFLICT OF INTEREST

Generally, upon concluding that reasonable grounds supported Defendant's LTD decision, the Court would evaluate whether a conflict of interest influenced that decision. As the Eleventh Circuit noted, "[a] pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." Blankenship, 644 F.3d at 1355. Even if a conflict of interest exists, it is " 'a factor' in the analysis: but the basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision." Id. (citing Conkright v. Frommert, 559 U.S. 506, 520 (2010)). Notably, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Doyle v. Liberty Life Assur. Co. of Bos., 542 F.3d 1352, 1360 (11th Cir. 2008).

In this case, Plaintiff has proffered no evidence that Defendant's decision was colored by a conflict of interest. Plaintiff has not alleged in her response (Doc. 16) to Defendant's motion for summary judgment that Defendant's decision is arbitrary and capricious due to a conflict of interest. Furthermore, Plaintiff's complaint contained no allegation that a conflict of interest made Defendant's decision arbitrary and capricious. The Court concludes that even if such a conflict exists, Plaintiff has not carried her burden of showing that the decision was arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Administrative Record (Doc. 13) is **GRANTED**. The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this 16th day of September 2016.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA